## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ (JKS) |
| Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC, | |
| Defendants. | |

## **COMPLAINT**

PCT Litigation Trust ("Plaintiff" or "PCT")[2] established in the above-captioned chapter 11

cases (the "Chapter 11 Cases"), by and through its undersigned counsel, files this complaint (the

"Complaint") against Defendants Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC

(collectively, "Defendants" or "Abra"), pursuant to Sections 544, 547, 548, and 550 of Title 11 of

the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Section 1304 of

Title 6 of the Del. Code Ann. (the "Delaware Code"), seeking to avoid and recover all preferential,

actual fraudulent, and/or constructive fraudulent transfers of property made by the Debtors to or

for the benefit of Abra (the "Transfers") plus interest, attorneys' fees, and costs.  To the extent that

---

[1]    The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime").  The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]    PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets.  PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

Abra filed a proof or claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtors or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j) ("Section 502"), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to Section 502 is sought by PCT herein as further stated in Count VI below.  PCT alleges as follows:

## INTRODUCTION

1.      The once prominent crypto custodian Prime lost access to a digital wallet holding millions of dollars' worth of crypto (the "98f Wallet").  To cover up those losses, Prime used fiat other customers had transferred to Prime to make sure that the withdrawal requests of a particularly unworthy customer associated with the 98f Wallet were satisfied in full.  That customer is Abra.  Despite being told for two months to stop, Abra continued to transfer Ether (ETH) to the 98f Wallet.  Desperate to maintain appearances and reputation, Prime honored each of Abra's subsequent withdrawal requests by buying new ETH using fiat other customers had transferred to Prime.  To cover up its loss of access to the 98f Wallet, Prime executed a series of fraudulent transactions and input false wire transfer entries in its internal accounting systems.  Abra must return the 23,778 ETH it received from Prime that was bought using fiat other customers had transferred to Prime as these ETH transfers to Abra were actual and constructive fraudulent transfers.  Abra also must return the $7,714,125.34 USD it received in preferential transfers from Prime.

2.      Abra was one of Prime's largest and most important customers.  It is the entity that transferred nearly all the crypto that remains locked in the 98f Wallet to this day.  But Abra is not an innocent customer.

3.      Prime did not discover that it could not access the 98f Wallet until December 2021, when Abra requested a withdrawal of 5,867.71 ETH.  Once Prime learned of its inability to access the 98f Wallet, it immediately sent instructions to Abra to stop transferring ETH into the 98f Wallet.  Prime repeated these instructions to Abra for over two months.  Abra did not follow any of those instructions from Prime and, instead, continued to transfer ETH into the 98f Wallet, causing significantly more ETH to become inaccessible and thus lost to Prime.

4.      Publicly available blockchain data made it obvious to Abra, a sophisticated "big player" in the crypto industry, Deposition of ▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "▮▮▮▮ Dep."), 76:24–25, that the ETH Prime was transferring it was not the same ETH that Abra had originally transferred to Prime.  Specifically, Abra could publicly see that none of the ETH it transferred to Prime ever left the 98f Wallet (where it still resides to this day) even though Abra was receiving tens of millions of dollars' worth of ETH from Prime.

5.      Nevertheless, Abra continued to transfer ETH into the "dark abyss" of the inaccessible 98f Wallet, as one Prime employee called it:

| ▮▮▮@primetrust.com | |
|---|---|
| But we should be able to complete it by early Jan... hopefully :crossed_fingers::skin-tone-2: :crossed_fingers::skin-tone-2: | 2021-12-24 12:15:42.000 AM |
| ▮▮▮@primetrust.com | |
| That feels very long … to have eth going into a dark abyss | 2021-12-24 12:16:09.000 AM |

6.    After Prime told Abra to stop transferring ETH to the 98f Wallet, Abra executed eight additional transfers to the 98f Wallet.  Of the 23,778 ETH[3] which is still locked away in the 98f Wallet, 12,696 of that ETH (or 53%) was transferred to Prime by Abra *after* Prime instructed Abra to stop executing these transfers:

| Date | Transfer Amount (ETH) |
|---|---|
| 01/07-04/21/21 (Prime recycles legacy wallets) | 40 ETH |
| 04/22-04/23/21 | 704 ETH |
| 08/12/21 | 1,575 ETH |
| 08/13/21 | 805 ETH |
| 09/08/21 | 259 ETH |
| 09/21/21 | 312 ETH |
| 12/09/21 | 2,280 ETH |
| 12/10/21 | 4,770 ETH |
| 12/14/21 | 337 ETH |
| **Pre-12/23/21 Transfers** | **11,082 ETH** |
| **12/23/21 Prime Tells Abra to Stop Transferring to 98f** | |
| 12/30/21 | 619 ETH |
| 01/07/22 | 1,427 ETH |
| 01/11/22 | 384 ETH |
| 01/21/22 | 1,540 ETH |
| 01/22/22 | 2,069 ETH |
| 01/23/22 | 1,465 ETH |
| 02/19/22 | 2,076 ETH |
| 02/24/22 | 3,116 ETH |
| **Pre-12/23/21 Transfers** | **12,696 ETH** |
| **TOTAL** | **23,778 ETH** |

7.    In transactions that Prime's executives described as "sketchy," Prime used fiat currency that had been transferred to it by other customers to purchase ETH from one of Prime's liquidity providers ("Liquidity Provider") to satisfy the withdrawal requests of Abra, which had been transferring ETH into the inaccessible 98f Wallet.

---

[3]    This Complaint references 23,778 ETH that Abra transferred into the 98f Wallet.  This is rounded up from the exact number of 23,777.727367022 ETH.

8.      But these were not ordinary purchases.  To increase Liquidity Provider's fiat account internal records at Prime without any new fiat currency actually coming in, Prime had to submit false wire entries into its internal accounting system.

9.      Because Prime did not have enough ETH to satisfy Abra's withdrawal requests, certain Prime executives, including ███████ ("█████"), ████████ ("████"), and ███ ("███"), tried to cover up the problem by using fiat other customers had transferred to Prime to purchase ETH from Liquidity Provider.[4]  The ETH purchased from Liquidity Provider was then, in turn, used for the ETH transfers to Abra.

10.     The Prime executives—such as ████, ███, and ███—were fully aware that they were using funds transferred to Prime by other customers to satisfy Abra's withdrawal requests:

> ███@primetrust.com                                     2022-01-25 06:57:44.000 PM
>
> For the purchase of the remainder of the other assets - are we taking the same path where we are going to use customer funds?
>
> ███@primetrust.com                                     2022-01-25 08:47:22.000 PM
>
> That's what I would expect. Do we have any other options?

11.     ███, who personally executed the transactions with Liquidity Provider at the instruction of other Prime executives like ████ and ███, characterized them as "sketchy" because "the fiat that had been deposited by other customers was being used to buy the ETH to satisfy Abra's withdrawals":

> Q:      When you say "uncomfortable," you think . . . the transaction
>         seemed sketchy?  What made you uncomfortable about it?

---

[4] ███, ███, and ███ are no longer employed by Prime.  During their time at Prime, ███ served as Chief Operating Officer, ███ served as President of Global Sales, and ███ served as Senior Vice President of Operations and Reconciliations.

A:      ***Yeah, it was sketchy***.  I thought that, if I didn't do this, then I'm going to be fired and let go, because I'm not listening.  So, you know, for me, it was either I—I do what these people are telling me to do or I lose my job.

Q:      Was your—***was your concern with the transactions that fiat that had been deposited by other customers was being used to buy the ETH to satisfy Abra's withdrawals***?

A:      Yeah.  ***Exactly***.

█████ Dep., 149:14–150:6 (emphasis added).

12.     While Abra continued making ETH withdrawal requests, Prime executives continued to use fiat funds transferred to Prime by other customers to purchase the ETH from Liquidity Provider necessary to satisfy Abra's withdrawal requests.

13.     In each instance, Prime executives falsified the company's business records by inputting fake wire transfer entries onto Prime's internal ledger (the "Internal Ledger").  Prime executives did this to conceal from regulators, the general public, and even others at the company the fact that they had lost access to the 98f Wallet and were misusing fiat transferred to Prime by other customers to cover the crypto shortfall.

14.     These fake wire transfers made it appear on Prime's Internal Ledger as if Liquidity Provider had transferred sufficient fiat to Prime's bank accounts to cover the fiat Liquidity Provider was receiving as payment for the replacement ETH transferred to Abra.

15.     Prime employees and executives admitted in contemporaneous communications and sworn deposition testimony that Prime's ETH purchases from Liquidity Provider used to satisfy Abra's withdrawal requests were papered using fake wire transfer line entries to conceal the true circumstances surrounding the purchases.  As ████ admitted, "there were no wire transfers":

Q:      Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?

A:      Yes, *there were no wire transfers*.

███ Dep., 165:6–10 (emphasis added).

16.     Ultimately, over a three-month period, Prime purchased 23,578 ETH[5] from Liquidity Provider worth $76,367,547.90 USD based on the value of ETH at the time of each respective purchase.

17.     Prime satisfied Abra's remaining withdrawal requests for 200 ETH tied to the ETH locked in the 98f Wallet by using ETH transferred to Prime by other customers that was held in Prime's commingled omnibus digital wallets.

18.     In addition, during the 90-day period (the "Preference Period") leading to the petition date of August 14, 2023 (the "Petition Date"),[6] Prime transferred a significant amount of fiat in which Prime had an interest to Abra.  Specifically, Prime has a fiat preference claim against Abra not less than $7,714,125.34 USD after accounting for subsequent new value and considering Abra's transaction activity with Prime over the course of their relationship.

19.     The agreements Prime had in place with Abra when the fraudulent transfers occurred and during the Preference Period make clear that Prime had a debtor-creditor—and not a trust or fiduciary—relationship with Abra.

20.     PCT has engaged third-party experts to determine if the assets that Abra or any of Prime's other customers transferred to Prime could be identified, traced, or segregated.  As detailed in the attached expert declaration, it would be impossible for anyone to trace or distinguish the assets that they initially transferred to Prime from other assets transferred to Prime by other

---

[5]   This Complaint references 23,578 ETH that Prime purchased from Liquidity Provider to satisfy Abra's withdrawal requests.  This is rounded-up from the exact number of 23,577.69 ETH.

[6]   The Debtors filed the Chapter 11 Cases on the Petition Date of August 14, 2023, meaning that Prime's non-insider Preference Period occurred between May 16, 2023 and August 14, 2023.

customers or from assets that Prime generated from its own business operations.  *See* Declaration of James P. Brennan in Support of PCT's Complaint Against Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC (the "Brennan Decl."), attached as Exhibit A.

21.    This impossibility is because Prime commingled all of the assets that its many customers transferred to Prime along with Prime's own assets.  Moreover, Prime's internal recordkeeping, including its Internal Ledger, were inadequately maintained throughout the company's history.

22.    Accordingly, PCT brings this adversary proceeding (the "Adversary Proceeding") seeking return of the 23,778 ETH transferred to Abra pursuant to sections 544(b), 548(a)(1)(A), and 550 of the Bankruptcy Code, and Section 1304 of Title 6 of the Delaware Code.  In the alternative, PCT seeks return of the 23,778 ETH transferred to Abra pursuant to sections 548(a)(1)(B) and 550 of the Bankruptcy Code.

23.    This action also seeks to recover $7,714,125.34 from Abra for the preferential transfers Prime made to Abra in the 90-day Preference Period prior to Prime's Petition Date pursuant to Bankruptcy Code sections 547(b) and 550.

24.    Pursuant to Section 502(d) of the Bankruptcy Code, PCT also seeks to disallow any claims filed or held by Abra in these Chapter 11 Cases unless and until Abra has relinquished to PCT all property it received in transfers that are determined by the Court to be avoidable and recoverable.

25.    During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to Abra that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid all such transfers made to or for the benefit of Abra and, accordingly, reserves the right to amend this Complaint.

## PARTIES

26.     Plaintiff PCT was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644]. The Plan was consummated on January 5, 2024 (the "Effective Date"). [*See* Docket No. 694]. On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust. *See* Plan, § 6.21. The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn. *See id.*, § 1.118.

27.     Defendant Plutus Financial Inc. is a corporation formed under the laws of Delaware and maintains a registered address in Dover, Delaware.

28.     Defendant Plutus Lending LLC is a Delaware limited liability company and maintains a registered address in Atlanta, Georgia.

29.     Defendants Plutus Financial Inc. and Plutus Lending LLC are affiliates operating under the common name of "Abra." Abra provides a platform which allows users to buy, sell, trade, and earn interest on crypto. Abra was one of Prime's former customers. Defendant Plutus Financial Inc. is registered as a money service businesses ("MSB") with the Financial Crimes Enforcement Network ("FinCEN"), but neither Defendants are licensed as money transmitters in any state.

30.     In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 539] (the "Plan Supplement"), Prime identified actual and constructive fraudulent transfer claims as "Vested Causes of Action" and preference claims against Defendants as "Exempted Preference Claims," and, thus, these claims were not released on the Effective Date of the Plan.[7]

## JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, the Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."  *See* Plan, § 12(c).  The Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."  *Id.*, §§ 12(s), (u).  As such, the Court retained jurisdiction to preside over this Adversary Proceeding.

32.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

---

[7]     Prime filed the Plan Supplement under seal.  [*See* Docket No. 539.]  PCT reserves its right to maintain the confidentiality over the remainder of the "Exempted Preference Claims" identified in the Plan Supplement.

33.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

34.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

35.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and sections 105, 542, 544, 547, 548, 550, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

36.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin (BTC) and ETH are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

37.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all the cryptocurrency transactions that

occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

38.     There are a number of different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens

39.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique Ethereum digital addresses, which are derived from public keys.  These Ethereum digital addresses are 40-character hexadecimal strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these digital addresses, including any time crypto is traded or any time a smart contract is used.

40.     Similarly, on the Bitcoin blockchain, digital wallets and their respective holdings are identifiable to the public by unique Bitcoin digital addresses, which are derived from public keys. Bitcoin digital addresses are shorter, hashed versions of public keys, which are digital addresses with long alphanumeric strings.  Using open-source platforms such as Blockchair, anyone can see the transaction activity of a specific digital address, as everything that occurs with BTC is recorded publicly on the blockchain.

41.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain wallet.  Like public keys, private keys similarly consist of multi-digit alphanumeric strings.  However, unlike public keys—which are knowable by the public and used

simply to identify a digital address—private keys are known only by the owner of the digital wallet and used by the owner to access and manage the digital wallet.

42.     Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets have no third party that is taking custody of the crypto.

43.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

44.     Digital wallet owners can choose to store their private keys in numerous ways. They can write down private keys on a piece of paper or store them on a personal computer device, although these methods are highly inadvisable due to the attendant risks of destruction, loss, or theft.

45.     Digital wallet owners also can use physical hardware devices to store private keys to access digital wallets, which is a more secure method.  These types of physical hardware devices are provided by companies such as Trezor:



46.     Digital wallet owners using hardware devices need to be in possession of their physical hardware devices to access their digital wallets.  If owners lose a physical hardware device, they may still be able to access the crypto stored on their digital wallets by transferring the

ability to sign transactions from the digital wallet to another physical hardware device. To do so, the owner must know the original digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as the password to access the private keys necessary to effectuate transactions in crypto. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

47.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto. Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction. Most smart contracts are designed so they can never be changed. One example of the use of a smart contract is a "forwarder" address. If someone sends crypto to a "forwarder" address, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet address.

48.     Transactions occurring on the blockchain incur fees. On the Ethereum blockchain, these are referred to as "gas fees." Gas fees refer to the costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain. In other words, they are fees charged by the blockchain itself for successfully completing a transaction on the blockchain. The exact amount of gas fees for a particular transaction can fluctuate based on factors such as the size of the transaction, supply, demand, and network activity at the time the transaction is made.

49.     However, on the Bitcoin blockchain, these are referred to simply as "transaction fees." Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive

for preventing network congestion and incorporating a transaction in the subsequent "block."   In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain.  Similar to gas fees in the case of ETH, the exact price of the transaction fee for a particular Bitcoin transaction can fluctuate based on factors such as the size of the transaction (in terms of bytes), supply, demand, and network activity at the time the transaction is made.

## GENERAL ALLEGATIONS

### I.     Prime Business Operations

50.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

51.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.  In the years that followed, Prime shifted its focus away from traditional assets and towards the crypto industry.

52.     Prime provided several services to crypto market participants, including Anti-Money Laundering/Know Your Client services, crypto liquidity services, compliance and regulatory services, and settlement services.

53.     But Prime's primary business offering was custodial services, which it offered to other companies in the crypto space.

54.     Customers of those companies entered commands into an Application Programming Interface ("API") embedded into the company's website, which pushed transaction requests to Prime, who executed the actual transmission of funds.

55.     Prime referred to this type of business model as "B2B2C," or "business to business to consumer."  ▓▓▓ Dep., 26:21–22.

56.     Important to this aspect of Prime's business, Prime held a trust charter from the State of Nevada.   Prime's Nevada trust charter exempted Prime from acquiring money-transmission licenses (each, an "MTL") in many states.

57.     Prime's trust charter enabled it to offer what is commonly known as "money-transmission-as-a-service" to other crypto companies who could utilize Prime as a means to access the market quickly without engaging in the time, effort, and compliance procedures necessary to obtain their own MTLs.

58.     As described by ████, Prime's customers were able to "leverage" Prime's trust charter so that they "d[id not] have to spend the money, time, [or] resources to get the [money-transmitter] licensing" themselves.   ████ Dep., 32:15–19.

## II.     The 98f Wallet

59.     In or around March 2018, as part of Prime's custodial services, Prime created and implemented several self-hosted digital wallets (the "Legacy Wallets").

60.     Prime self-hosted the Legacy Wallets, meaning that Prime managed the Legacy Wallets on its own and without the assistance of any third party.

61.     Prime used the Legacy Wallets to maintain and store crypto transferred to it by Prime's customers.

62.     One such Legacy Wallet used by Prime was the 98f Wallet.[8]  The 98f Wallet is a "multi-sig" digital wallet, meaning that access to the 98f Wallet requires multiple digital "signatures" to execute a transaction.

---

[8]     This Legacy Wallet is referred to herein as the "98f Wallet" because it has an address ending in the characters "98f."

63.     The 98f Wallet has six authorized "signers" in total, and the signatures of three of these six signers are required to access and transact from the 98f Wallet.

64.     Prime utilized a smart contract which governed several forwarder digital addresses (the "Forwarder Addresses") for customers to transfer crypto in connection with its Legacy Wallets.

65.     Prime designed the Forwarder Addresses such that they would immediately and automatically forward any crypto transferred to them to the Legacy Wallets, including the 98f Wallet.

66.     Because Prime held the crypto that customers transferred to it in omnibus digital wallets, as opposed to in segregated digital wallets for each customer, the purpose of the Forwarder Addresses was for Prime to be able to determine which cryptocurrencies were sent to Prime by which customers for the purpose of figuring out how much crypto Prime owed each of its customers.

67.     Prime's use of the Forwarder Addresses is explained in further detail in the below internal Prime email from ▇▇▇ on August 11, 2020:

> On Tue, Aug 11, 2020 at 5:16 PM    ▇▇▇▇▇▇▇@primetrust.com> wrote:
>
> Hey ▇▇▇▇
> This is for our ETH forwarding contract. We use this forwarding contract so we are able to accept payments in a way where we can identify each customer individually. This can only be done by creating a unique address per customer via our ETH forwarding contract. Each address is similar to how we generate a Q code for each account and contact to identify wires that are sent to our clearing account. Sincce we use each address generated per account almost like a clearing account, we need to then sweep the ETH into our central ETH wallet.

68.     In or around July 2019, Prime began migrating the crypto it self-hosted with the Legacy Wallets to a crypto-security platform managed by Fireblocks LLC ("Fireblocks").

69.    In conjunction with Prime's migration to Fireblocks, Prime sought to phase out the Legacy Wallets.  Prime stopped utilizing the Legacy Wallets in its business operations, migrated the crypto it previously held in the Legacy Wallets to Fireblocks, and directed its customers to stop transferring crypto to the Legacy Wallets—including the 98f Wallet.

70.    Prime also implemented new Forwarder Addresses which directed crypto to Prime's digital wallets hosted by Fireblocks to replace the old Forwarder Addresses which directed crypto to the Legacy Wallets.

71.    Prime referred to this practice as "deprecating" the Legacy Wallets.

72.    By the first quarter of 2020, Prime had completed its migration of its crypto to Fireblocks.

III.    **The Recycling of the Legacy Wallets**

73.    In or around January 2021, Prime discovered that it was incurring significant costs in connection with ETH transfers by its customers.

74.    While some members of Prime mistakenly believed that these costs were associated with Ethereum gas fees associated with the generation of new digital addresses on the Ethereum blockchain for Prime accounts, the costs appear to have actually been the result of fees charged by Fireblocks.

75.    On January 4, 2021, ███ brought these costs to the attention of Prime's management and suggested that, until a long-term solution with Fireblocks could be reached, Prime "ha[d] a pool of ~170 addresses that c[ould] be deployed" to store ETH transferred to Prime by customers:



76.     The digital addresses ▓▓ suggested "c[ould] be deployed" consisted of the Legacy Wallets that Prime self-hosted and previously used to store crypto transferred to it by customers, including the 98f Wallet.

77.     ▓▓ was suggesting that Prime "recycle" the Legacy Wallets.  "Recycling" a digital wallet simply meant taking an old digital wallet address, which was not currently in use but available to Prime and under Prime's control, and reimplementing it into Prime's operations to store crypto, as described in the deposition testimony of ▓▓:

Q:     What does it mean to recycle a wallet?

A:     Well, I can give you kind of my interpretation of that terminology. I mean, I would view a wallet as—recycling a wallet, all I would say is it's a wallet that's no longer being used, it's available for use. Right?

> Q:    So it would be taking a wallet that is available to use and using it again.
>
> A:    Correct.
>
> Q:    And isn't that what ██████'s describing here in this paragraph, or is it not?
>
> A:    Yeah, that's my interpretation, yes.

Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023) (the "██████ Dep."), 39:9–25.

78.    ██████ explained that Prime eventually decided to follow ██████'s suggestion and recycled the Legacy Wallets, including the 98f Wallet, to store assets transferred from customers to Prime:

> Q:    There ultimately was a decision to recycle old digital wallet addresses, right?
>
> A:    That's correct, yes.
>
> Q:    And when I say "recycle old digital wallet addresses," I'm referring to providing customers deposit digital addresses that led to preexisting Prime digital addresses.  Is that your understanding?
>
> A:    Can you repeat the way you said that, please.
>
> Q:    Sure, when I'm saying "recycling wallet addresses," I mean providing Prime's customers with deposit digital addresses which lead to preexisting Prime wallets.
>
> A:    Yes.

*Id.*, 47:1–19.

79.    In connection with the recycling of the Legacy Wallets, Prime also recycled some of the Forwarder Addresses that previously had been used to route crypto transfers to the Legacy Wallets.

80.    One such Forwarder Address recycled by Prime routed crypto to the 98f Wallet (the "98f Forwarder").  Prime provided this 98f Forwarder Address to Abra.

## IV.    The Fraudulent Transfers to Abra

### A.    Abra's ETH Withdrawal Request Reveals to Prime that Prime Cannot Access the 98f Wallet

81.    Abra is a global crypto company and was one of Prime's most prominent customers.

82.    Abra provides customers with digital wallet services, liquidity services, and a trading platform to buy and sell crypto.

83.    Abra also offers programs which allow its customers to earn interest on their crypto held with Abra.

84.    As ▮▮ put it, Abra offered "insane yield options to its clients," which ▮▮ viewed as highly risky.[9] ▮▮ Dep. 130:14; 21–22.

85.    Abra is a prominent market participant in the crypto industry, which ▮▮ described as "a very big player in the crypto space." ▮▮ Dep., 76:24–25.

86.    Abra is a sophisticated crypto company that manages crypto for users across the world.

87.    Abra's high level of expertise was demonstrated by its website, which, until recently, Abra used to educate the general public on all things crypto. *See Invest in Crypto*, Abra,

---

[9]    Yield-earning programs provided by crypto companies have become the target of heavy regulatory scrutiny, as regulators believe that these products constitute unregistered securities and have brought numerous enforcement actions against companies that provide such programs to their customers. *See, e.g.*, *Sec. & Exch. Comm'n v. Genesis Global Capital, LLC, and Gemini Trust Company*, LLC, No. 23-CV-287, Docket No. 1 (S.D.N.Y. Jan. 12, 2023); *In the Matter of BlockFi Lending LLC*, Securities Act of 1933 Release No. 11029, Investment Company Act of 1940 Release No. 34503, Administrative Proceeding File No. 3-20758 (Feb. 14, 2022).

Indeed, in June 2023, the Texas State Securities Board brought an enforcement action against Abra in which it alleged that Abra's yield-earning program was a security and that Abra engaged in fraud and made misleading statements in connection with its yield-earning program. *See In the Matter of Plutus Financial, Inc. DBA Abra, Plutus Lending, LLC DBA Abra, Abra Boost LLC and William John "Bill" Barhydt*, Tex. State Sec. Bd. Order No. ENF-23-CDO01873 (June 15, 2023).  Abra ultimately settled with the Texas State Securities Board in January 2024.  *See Texas Securities Board Settles with Abra Over National Sales of Interest-Bearing Accounts*, Tex. State Sec. Bd. (Jan. 2024), https://ssb.texas.gov/news-publications/texas-securities-board-settles-abra-over-national-sales-interest-bearing-accounts.

https://web.archive.org/web/20240721193537/https://www.abra.com/cryptocurrency/ (captured Jul. 21, 2024).

88.     For example, the topics that Abra provided education and guidance on ranged from basic concepts such as "[w]that is cryptocurrency" and "[h]ow does cryptocurrency work," including ETH, to more technically complex concepts such as "smart contracts," "private keys", "proof-of-work," "proof-of-stake," and "[c]ryptocurrency mining".[10] *Id.*

89.     In October 2020, Prime and Abra executed a "Prime Trust New Account Agreement" whereby Abra "appoint[ed] Prime Trust to be custodian of and to hold or process as directed all securities, currency, cryptocurrency, and other assets of [Abra] . . . that are delivered to" Prime.    Prime Trust New Account Agreement, dated October 20, 2020, between Plutus Lending LLC and Prime Trust, LLC (the "Abra New Account Agreement"), attached as Exhibit B, § 1.

90.     Pursuant to the Abra New Account Agreement, Prime was authorized to "for convenience take and hold title to Custodial Property [transferred to Prime by Abra] or any part thereof in its own name or in the name of its nominee (commonly known as 'street name'), with [Abra] ownership of Custodial Property segregated on its books and records." *Id.* § 4(c).

91.     "During the term of th[e] [Abra New Account Agreement], [Prime] [wa]s responsible for safekeeping ***only*** Custodial Property ***which is delivered into its possession and control*** by [Abra]." *Id.* § 4(c) (emphasis added).

92.     The Abra New Account Agreement also authorized Prime to "hold the proceeds" deriving from the maturity, redemption, or sale of the assets Abra deposited with Prime. *Id.* § 4(e).

---

[10]    Abra even offered a "free e-book" that it styled as the "Ultimate Cryptocurrency Guide" to "provide a basic overview about how cryptocurrencies work and why people are using them." *See Ultimate Cryptocurrency Guide*, Abra, https://web.archive.org/web/20240721193539/https://www.abra.com/cryptocurrency/ultimate-cryptocurrency-guide/ (captured Jul. 21, 2024).

93.     As early as May 2021, Abra noticed that certain ETH transactions it executed were not appearing on Prime's system.

94.     For example, internal Prime communications from May 30, 2021, discuss how Abra complained that one such transaction for $485,000 worth of ETH "[wa]sn't showing" in Prime's system:



95.     Subsequently, throughout August and September 2021, Abra repeatedly identified discrepancies between Prime's and Abra's records.

96.     Because of those discrepancies, Abra sought more transparency about the assets it had transferred to Prime.

97.     For example, on September 16, 2021, ███ described Abra's requests for new "vaults":



From:        █████████ @primetrust.com]
Sent:       Thur 9/16/2021 11:35:31 AM (UTC-07:00)
To:         █████████ @primetrust.com]
Cc:         █████ @primetrust.com]; ████████ @primetrust.com];
                        █████ @primetrust.com];
                        █████ @primetrust.com]; ████████ @primetrust.com];
                        █████ @primetrust.com]; ████████ @primetrust.com];
                        █████ @primetrust.com];
                        █████ @primetrust.com]; ████████ @primetrust.com];
                        █████ @primetrust.com]; ████████ @primetrust.com]
Subject:     Re: Abra segregated vault

Hi Team,
I spend the morning reviewing the original project charter we established after initial discussions
and I am unsure how we are able to satisfy Abra's requirements by simply setting up new
"vaults" for them. I am unsure if more conversations occurred after our original discussion(s) but
from my understanding, the solution(s) need to encompass the following for Abra:

1. Allow Abra visibility of holdings at PT via on-chain lookups
2. Allow Abra the ability to reconcile balances via on-chain lookups
3. Provide Abra an independent solution where assets are segregated from all other PT
customers

    98.     According to ████, these proposed solutions came directly from Abra because Abra

wanted to conduct its own reconciliation of the assets it held with Prime instead of relying on

Prime to do so:

> Q:    What was Abra—Abra asking for?
>
> A:    So, I believe, because there's delays in their transactions, what they
> requested was a way to do a reconciliation themselves of, you know,
> their holdings at Prime Trust, as well as the transactions at Prime
> Trust. So—does that make sense?
>
> Q:    I'm not sure. So what were they asking Prime to do with their
> assets?
>
> A:    Prime Trust—they were asking Prime Trust to essentially segregate
> all of their assets from every other clients', so that Prime Trust can
> say, these are your wallet addresses and your assets are held in these
> wallet addresses.

████ Dep., 80:22–81:13.

    99.     As reflected by the above communication and testimony by ████, Abra was

requesting that Prime provide it with "on-chain lookups," meaning that Abra was focused on

reviewing blockchain data to ensure that the crypto Abra provided was being credited to its account and provided back to Abra.

100.    In December 2021, after continued delays in disbursements from Prime, Abra involved its top-level executives in the matter, as described in the below email from Prime's former Director of Strategic Accounts, ▌▌▌▌▌▌ ("▌▌▌▌"):



On Wed, Dec 15, 2021 at 8:50 AM ▌▌▌▌▌▌▌ @primetrust.com> wrote:

Hello Everyone,

I want to bring up an issue that Abra is seeing on a consistent basis. They are seeing consistent delays with disbursements going out. They have been patient with us, but now they are going to get their CEO involved. We need to get this resolved ASAP because this is a bad customer experience.

101.    According to Prime's internal communications from December 2021, the delays in disbursing funds to Abra were "introducing doubt with [Prime's] system and *how secure [Abra's] funds [were] with [Prime]*" (emphasis added):



From: ▌▌▌ @primetrust.com>
Sent: Wednesday, December 15, 2021 10:14 AM
To: ▌▌▌ @primetrust.com>
Cc: ▌▌▌ @primetrust.com>; ▌▌▌ @primetrust.com>;
▌▌▌ @primetrust.com>; ▌▌▌ @primetrust.com>;
▌▌▌ @primetrust.com>; ▌▌▌ @primetrust.com>
Subject: Re: ETH Disbursement Issues for Abra

Hey Team,

I just got off the phone with Willie, Justin (new CFO) and Ben, they would like to have a call with our heads to discuss their concerns with how we are handling their assets (funds). Right now they are concerned with these delays which is introducing doubt with our system and how secure their funds are with us. I let them know that they are secure, but they would like to have have a call. Please let me know who and when I can set this up.

102.    On December 21, 2021, Abra requested a withdrawal of 5,867.71 ETH from Prime (worth approximately $24,000,000.00 USD at the time of the request) (the "December 21 Withdrawal Request"). *See* Ex. A, Brennan Decl., ¶ 45.

103.    After receiving the December 21 Withdrawal Request, Prime uncovered "a large discrepancy between [Prime's] ledger and Fireblocks['s] [which was] showing a larger amount of ETH (~9000) than what is shown in Fireblocks":

████ @primetrust.com

2021-12-22 07:16:57.000 PM

Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @████ and @████ ████████ are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

████ @primetrust.com

104.    Further investigation into this ETH discrepancy revealed that the digital address to which Abra had been directing its ETH transfers was the 98f Forwarder, which, in turn, routed the ETH into the 98f Wallet, as demonstrated by the below messages from Prime's former Vice President of Product, ████████ ("████"):

████ @primetrust.com

2021-12-22 09:38:44.000 PM

well, this is definitely interesting cause the transaction is not even old but somehow it got forwarded to a different address 🌀 and that address was created by our master contract but don't know why it would be forwarding things to that address instead of the normal behavior that would be to forward to our vault 0 address 😬

████ @primetrust.com

2021-12-22 09:42:44.000 PM

@████ no one currently at the company knows anything about the smart contract nor knows about the code in there. However what I can tell you is that that contract was created almost 3 years ago and the address where is forwarding too is a multisig address. By the time we were trying to move away from forwarders I remember we freed up some old addresses that had never been used in order to have available forwarding contracts (because we didn't want to create more) as part of those addresses we probably freed up addresses that had been deployed with an older version of the Smart contract and that forwarded to a different address (most likely outside of Fireblocks since this is almost 3 years old)

105.    At the time of Abra's December 21 Withdrawal Request, Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000.00 USD at the time) to the 98f Wallet. *See* Ex. A, Brennan Decl., ¶ 46.

106.    At this same time, Prime executives began to become "concerned" about their ability to access the 98f Wallet, as demonstrated by the below communication from ▆▆▆▆:

> ▆▆▆ @primetrust.com
>                                                                     2021-12-23 05:29:55.000 PM
> I'm concerned about an address that may have been provided to customer that may have been inactive for a while then customer suddenly decides to send some funds to it. All we know at this point is that it may be pointing to that multi dig wallet or potentially another wallet.

107.    Prime soon realized that it did not have access to any of the "signers" required to access the 98f Wallet and that it was not even able to identify who the "signers" were or if they still worked for the company.

108.    Prime further discovered that it did not possess and was unable to locate the physical hardware devices which stored the private keys necessary to access the 98f Wallet or the seed phrases associated with the physical hardware devices.

109.    Without access to the signers, physical hardware devices, and seed phrases, Prime had no way to access the 98f Wallet and the crypto stored therein.

110.    Because Prime could not access the crypto stored on the 98f Wallet, it did not possess sufficient ETH to satisfy Abra's December 21 Withdrawal Request (and subsequent ETH withdrawal requests made by Abra).  This is demonstrated by the below correspondence between ▆▆▆ and ▆▆▆ when Prime first discovered the ETH imbalance, wherein ▆▆▆ states "I don't know where we are going to get that much ETH":



111.    To date, Prime is still unable to regain access to the crypto stored on the 98f Wallet.

**B.      Abra Ignores Prime's Instructions to Stop Transferring ETH to the 98f Forwarder**

112.    As had occurred in the preceding months, Abra's December 21 Withdrawal Request and subsequent withdrawal requests were initially met with some delays from Prime in honoring the requests.

113.    This time, the reason for the delays was that the December 21 Withdrawal Request revealed to Prime the issues that Prime had with the 98f Wallet and its ability to access the crypto it owed to Abra.

114.    Abra personnel told Prime the withdrawal delays were unacceptable:



115.    In January 2022, Abra Chief Executive Officer Bill Barhydt contacted Prime personnel regarding the withdrawal delays, informing Prime that Abra's customers were becoming "irate":

116.    Upon discovering that Abra was transferring ETH to the inaccessible 98f Wallet, Prime contacted Abra to instruct it to stop sending assets to Prime through the 98f Forwarder Address and to use different digital addresses (which did not route crypto to the 98f Wallet) provided by Prime.

117.    On December 23, 2021, two days after the December 21 Withdrawal Request, Prime sent the following email to Abra:

```
---------- Forwarded message ----------
From: ████████████ @primetrust.com>
Date: Thu, Dec 23, 2021 at 14:45
Subject: Wallet Addresses
To: Justin Mcmahan <justin@abra.com>, Mike Zaczyk <mike@abra.com>, Ben Liams <ben@abra.com>, Willie Wang <willie@abra.com>,
Arthur Obrzut <aobrzut@abra.com>, Qasim Farooq <qasim@abra.com>


Hello team,

Prime Trust is implementing multiple improvements for digital asset custody in our production environment. As part of these changes, Abra
will need to deprecate usage of the addresses listed in the table below.

By way of background, Prime Trust is moving away from using forwarding addresses for deposits.
```

| Wallet Address | Asset Transfer Method ID |
| --- | --- |

118.    Abra refused to comply with Prime's instructions to cease sending crypto to the 98f Forwarder and, ultimately, the 98f Wallet.

119.    Prime continued to instruct Abra to stop sending crypto to the 98f Forwarder and to use the new digital addresses for its transfers to Prime.

120.    Between December 23, 2021 and February 24, 2022—a period of two months—Prime incessantly instructed Abra in writing via email and other messaging platforms to stop transferring ETH to the 98f Forwarder.  *See* <u>Ex. A</u>, Brennan Decl., ¶ 46.

121.    Prime instructed Abra on a weekly, and sometimes even daily, basis to implement the new digital addresses for its transfers to Prime.  Abra instead constantly delayed and pushed off in response.

122.    Some of the repeated efforts by ████████ to get Abra to stop transferring crypto to the 98f Forwarder, along with examples of Abra ignoring or delaying following these instructions, are demonstrated below:



123.    ███ recalled ███████ reaching out to Abra "every single day" and stating that Abra was not being "proactive" in response to Prime's instructions to change the digital addresses where Abra was transferring crypto:

> Q:    And do you remember ███ tell you that he's been pinging Abra every day, trying to get them to change their deposit digital addresses?
>
> A:    Yeah, I remember him telling them . . . .
>
> Q:    So, what did—how did ███ describe his conversations with Abra to you?  What did he say?
>
> A:    ***I think the premise was Abra was not as, I guess, proactive or as fast as—as we wanted; [he was] in a meeting convincing them every single day to do this.***

███ Dep., 119:14–19; 120:2–9 (emphasis added).

124.    Despite Prime's repeated instructions to change addresses, Abra did not comply. Instead, Abra continued to transfer additional ETH into the 98f Wallet, with its final transfer into the 98f Wallet occurring on February 24, 2024.  *See* Ex. A, Brennan Decl., ¶ 46.

125.    Abra's refusal to comply with Prime's instructions resulted in Abra sending significantly more ETH into the 98f Wallet than would have been transferred there had Abra followed Prime's repeated instructions.

126.    As ███ put it, "[i]f they stopped sending assets to this wallet address, they would stop being deposited to 98f." ███ Dep., 106:18–20.

127.    Instead, Abra transferred an additional 12,696 ETH to the 98f Wallet—53% of the total amount of ETH currently in the 98f Wallet—after Prime instructed Abra to stop:

| Date | Transfer Amount (ETH) |
|---|---|
| 01/07-04/21/21 (Prime recycles legacy wallets) | 40 ETH |
| 04/22-04/23/21 | 704 ETH |
| 08/12/21 | 1,575 ETH |
| 08/13/21 | 805 ETH |
| 09/08/21 | 259 ETH |
| 09/21/21 | 312 ETH |
| 12/09/21 | 2,280 ETH |
| 12/10/21 | 4,770 ETH |
| 12/14/21 | 337 ETH |
| **Pre-12/23/21 Transfers** | **11,082 ETH** |
| **12/23/21 Prime Tells Abra to Stop Transferring to 98f** | |
| 12/30/21 | 619 ETH |
| 01/07/22 | 1,427 ETH |
| 01/11/22 | 384 ETH |
| 01/21/22 | 1,540 ETH |
| 01/22/22 | 2,069 ETH |
| 01/23/22 | 1,465 ETH |
| 02/19/22 | 2,076 ETH |
| 02/24/22 | 3,116 ETH |
| **Pre-12/23/21 Transfers** | **12,696 ETH** |
| **TOTAL** | **23,778 ETH** |

128.    Due to Prime's delays in honoring withdrawal requests and Prime's repeated instructions to Abra to change its Forwarder Address, Abra should have suspected that it was not being transferred the crypto that it originally transferred to Prime.

129.    A reasonable inquiry into the Prime transfers would have confirmed this to Abra. Indeed, even a cursory review of the Abra transfers to Prime—which is publicly available on the Ethereum blockchain—would have revealed to Abra that the ETH it transferred to Prime never moved and remains there today:



130.    Abra is a sophisticated crypto company that possesses high-level expertise on all matters involving crypto.

131.    Abra was fully capable of accessing this information and discovering that the ETH it had deposited with Prime never moved, or that no transactions had been made out of the 98f Wallet which held Abra's ETH since January 2020.

132.    Abra ignored the obvious warning signs it had already complained about to Prime and ignored Prime's repeated instructions to stop transferring ETH to the 98f Forwarder.

133.    Abra exacerbated the situation by continuing "to have eth going into a dark abyss," as noted below:



134.     Abra could have easily avoided over half of the ETH becoming trapped in the 98f

Wallet if it had complied with Prime's request to stop transferring assets to the 98f Forwarder.

135.     According to ████, changing the digital address should have been a top priority for

Abra if it wanted to "safeguard" assets:

> Q:     If you were a client of Prime and you were told to deposit into a new
>         digital address, how long would it take you to do that?
>
> A:     Instantly.   Transparently, you're being communicated that, you
>         know, you need to move over and you want to safeguard your assets,
>         you would assume that you'd prioritize this.

████ Dep., 128:25–129:2–9.

**C.     Prime Decides to Use Fiat Transferred to Prime by Other Customers to
         Purchase Replacement ETH to Cover Prime's Shortfall and Debt to Abra**

136.     Despite Abra's refusal to comply with Prime's requests that Abra stop transferring

ETH to the 98f Forwarder, and despite Prime's inability to obtain the ETH stored on the 98f Wallet,

Prime executives made sure that Abra did not lose anything by satisfying Abra's withdrawal

requests using funds other customers had provided to Prime.

137.     Prime considered Abra to be "a very big player in the crypto space" and an

important customer for Prime. ████ Dep., 76:24–25.

138.     Prime wanted to protect its relationship with Abra.

139.   Prime also was concerned about publicly revealing that it had lost access to a significant amount of its assets and the consequences it would face from its customers, regulators, and auditors.

140.   When faced with Abra's December 21 Withdrawal Request, Prime executives decided to use fiat other customers provided to Prime to purchase replacement ETH from Liquidity Provider to give to Abra.



141.   The Prime executives involved in the decision to use fiat transferred to Prime by other customers to purchase replacement ETH to cover Abra's withdrawals requests included ▮▮▮▮, ▮▮▮, and ▮▮▮.

142.   The decision is described by testimony from ▮▮▮, who made clear that the "fiat used to buy the ETH to satisfy the withdrawals was fiat that was originally provided to Prime Trust by other customers":

> Q:   So—but when Abra requested withdrawal, ultimately, Prime provided the ETH they requested; right?
>
> A:   Yes.
>
> Q:   How did Prime do that?
>
> A:   Great question.  We were instructed, or I was instructed to purchase ETH for these transactions.
>
> Q:   So walk me through it.  How did you do it?

A:    Sure.  ***So I was instructed by*** ▮▮▮▮▮ ***and*** ▮▮▮▮▮
***specifically to make these purchase requests using funds or fiat
that was in Prime Trust custody to face off with liquidity providers,
in this instance, I think most of them were [Liquidity Provider], to
purchase the ETH using clients' funds to buy the ETH.  The ETH
then gets deposited into Fireblocks then, to service the request of
Abra.***

Q:    When you say using client funds, what do you mean?

A:    Exactly that; using fiat that was held at Prime Trust by—that was
other client's funds.

Q:    So you're talking—

A:    And—

Q:    Go ahead.

A:    ***No, it was just—exactly.  Clients held balance [of] fiat with Prime
Trust; using the client balances [of] fiat at Prime Trust to
purchase ETH for Abra transactions.***

Q:    ***So the fiat used to buy the ETH to satisfy the withdrawals was fiat
that was originally provided to Prime Trust by other customers?***

A:    ***That is correct.***

▮▮▮ Dep., 136:20–138:10 (emphasis added).

143.    Prime's Internal Ledger notes that, between December 23, 2021 and March 30,
2022, Prime arranged for ten different purchases of ETH from Liquidity Provider, totaling 23,578
ETH worth $76,367,547.90 USD based on the value of ETH at the time of each respective
purchase, which were funded by fiat transferred to Prime by other customers (the "Replacement
ETH Purchases"):

| Date | USD Internal Ledger "Wire" Transfer[11] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250 |
| 1/6/2022 | $2,778,400 | 800 |
| 1/6/2022 | $7,293,300 | 2,100 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000 |
| 3/29/2022 | $7,902,800 | 2,300 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

*See* <u>Ex. A</u>, Brennan Decl., ¶ 49.

144.    Prime made the Replacement ETH Purchases to cover Abra's December 21 Withdrawal Request and subsequent withdrawal requests (collectively, the "<u>Abra ETH Withdrawals</u>"):[12]



*See id.*, ¶ 51.

---

[11]    Prime did not actually execute any of these wire transfers.  *See* ▮▮▮ Dep., 164:22–165:10.

[12]    Abra continued to withdraw ETH from Prime after the discovery of the issues with the 98f Wallet and ultimately withdrew far more ETH from Prime than what it had transferred to the 98f Wallet.  For example, just between December 23, 2021 and March 30, 2022, Abra withdrew 48,034.57 ETH from Prime—more than double the amount of ETH locked in the 98f Wallet.  *See* <u>Ex. A</u>, Brennan Decl., ¶ 49.

145.   For each of the Replacement ETH Purchases, Prime continued to "take the same path where [it] . . . use[d] customer funds" because it believed that it did not "have any other options," as reflected by the following conversation between ▊▊ and ▊▊ in January 2022:



146.   Testimony from ▊▊ further confirms that Prime's operational reserves were never used, or even considered for use, to fund the Replacement ETH Purchases:

> Q:   Do you recall any other options [other than the use of fiat transferred by customers] for funding [the Abra] withdrawal?
>
> A:   I don't, no.

▊▊ Dep., 101: 6–8.

### D.   Prime Conceals Its Purchases of Replacement ETH by Intentionally Corrupting Its Internal Ledger

147.   Prime settled the Replacement ETH Purchases by increasing, on paper, Liquidity Provider's fiat balance at Prime.  But, in reality, no new fiat was ever provided to Prime by Liquidity Provider commensurate with those paper increases.  When Liquidity Provider withdrew

that fiat from Prime it would be withdrawing fiat other customers had provided to Prime.  *See* <u>Ex.</u>
<u>A</u>, Brennan Decl., ¶¶ 49–50.

148.    To effectuate this settlement by increasing Liquidity Provider's fiat balance, Prime

executives had to input fake wire transfer entries to create the appearance that Liquidity Provider

had transferred fiat to Prime.  *See id.*, ¶ 53.  Despite the fake internal records of wire transfers,

bank statements and testimony reveal that Liquidity Provider did not make any of those wire

transfers.

149.    Executives at Prime settled the Replacement ETH Purchases by "credit[ing] the

funds to [Liquidity Provider's] PT account":



*See also id.*, ¶¶ 54–55.

150.    ████ stated that Prime made a "contribution" to Liquidity Provider on Prime's

Internal Ledger to create the false appearance that Prime was holding more fiat in its bank account

so that it could increase Liquidity Provider's fiat balance at Prime:

> Q:    Okay.  So in order to credit [Liquidity Provider]'s cash account at
> Prime, there needed to be a contribution on the internal Ledger; is
> that right?
>
> A:    Correct.
>
> Q:    ***And once there is a contribution to the internal Ledger, then when***
> ***[Liquidity Provider] goes to its account, it looks like there is more***
> ***cash in the account; isn't that right?***

> A:     ***Correct.***
>
> Q:     ***There's not actually any more cash in the bank account; right?***
>
> A:     ***No, there is no—there is no credit of that money to the bank accounts, only to the Ledger.***

████ Dep., 155:11–156:9 (emphasis added).

151.     As further described below by ████, when Liquidity Provider withdrew fiat from Prime it was thus withdrawing fiat other customers had provided:

> Q:     ***When [Prime] wired out to [Liquidity Provider], that would be wiring out of the account that held cash that other customers had deposited; right?***
>
> A:     ***Yes.***

████ Dep., 167:20–23 (emphasis added).

152.     This method of settling the Replacement ETH Purchases was designed so that Prime could conceal its use of fiat transferred to it by other customers for the Replacement ETH Purchases and the fact that it had lost access to the 98f Wallet.

153.     Prime's primary concern was to avoid detection by customers, creditors, regulators, and law enforcement.  Prime wanted to protect its reputation in the crypto industry.

154.     As discussed in the internal Prime email thread below, Prime executives believed that this method of settlement would lead to less "scrutiny" from the Nevada Department of Business and Industry Division of Financial Institutions ("Nevada FID"):



155.    ▆▆▆ corroborated that Prime was trying to hide these transactions from its regulators:

> Q:    And FID is Nevada Financial Institution Division; right?
>
> A:    I think so.  Yeah.
>
> Q:    And so, what is ▆▆▆ talking about when he's saying "minimizing FID scrutiny during audit time"?
>
> A:    It wasn't a—I think what he's saying is, you know, when FID comes to do their regular—regulatory reviews with us, you know, how do—how do they get around—or not get around, but how do they minimize, you know, the scrutiny that FID would come down on Prime Trust for doing this.
>
> Q:    *So ▆▆▆'s saying, it sounds like, it would be easier to hide it from FID if we do it internally as opposed to externally; is that right?*
>
> A:    *That's—that's what he was trying to do, yeah.*

█████ Dep., 152:18–153:13 (emphasis added).

156.   Prime executives who discovered the issues concerning the 98f Wallet, such as

█████, ███, and █████ kept these transactions secret:

> Q:   Was there—there was a discussion at Prime as to who was going to
> know about 98f and who wasn't; isn't that fair to say?
>
> A:   Yeah, we agreed. ***Specifically, I was told that I was not supposed
> to talk to specific—or I was only supposed to talk to specific people
> there***.
>
> Q:   Who told you that?
>
> A:   The executives, █████████, █████████, █████████.

█████ Dep., 133:15–25 (emphasis added).

157.   The Replacement ETH Purchases left Prime with insufficient fiat in its bank

accounts to cover Prime's obligations to the rest of its customers. *See* <u>Ex. A</u>, Brennan Decl., ¶ 52.

158.   Prime executives knew that the Replacement ETH Purchases were falsely "inflating

[Prime's internal] ledger":



> ███@primetrust.com
>
> 2021-12-23 03:40:01.000 AM
>
> If we don't credit our ledger to settle, our bank account is plus the difference compared to the bank
>
> ███@primetrust.com
>
> 2021-12-23 03:42:16.000 AM
>
> The difference is are we okay with inflating our ledger vs having our bank account be out the difference compared to our ledger
>
> ███@primetrust.com
>
> 2021-12-23 03:44:15.000 AM
>
> Whatever you think is easier to reconcile once we get access to the locked ETH

159.   This false inflation of Prime's Internal Ledger was described by █████ at his

deposition:

> Q:   [T]here's going to be cash reflected in [Liquidity Provider]'s
> account, but that cash is not actually in the bank; is that right?
>
> A:   Correct.  Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:    Correct . . . .

Q:    I see.   But the Ledger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.

█████ Dep., 144:11–20; 146:7–15.

160.    To deal with the issue of Prime's inflated Internal Ledger, ████ falsified accounting entries that made it appear as if there were incoming wire transfers to Prime equivalent to the amount of fiat Prime moved into Liquidity Provider's balance on Prime's Internal Ledger.

161.    Prime did this to make it appear on its Internal Ledger that Liquidity Provider had wired fiat to Prime to justify the increased fiat balance for Liquidity Provider reflected on Prime's Internal Ledger.

162.    As demonstrated below,[13] Prime's Internal Ledger displayed that there were "incoming" wire transfers to Liquidity Provider equivalent to the amounts of fiat Prime credited to Liquidity Provider to fund the Replacement ETH Purchases:

---

[13]    This illustrative chart is not an image directly copied from Prime's Internal Ledger.  Rather, this chart contains data related to certain transactions that was pulled from Prime's Internal Ledger.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ████████████0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ████████████0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ████████████b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ████████████5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ████████████6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ████████████777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ████████████2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ████████████1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ████████████113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ████████████ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | **Total** | **76,367,547.90** |

See Ex. A, Brennan Decl., ¶ 58.

163. A review of Prime's bank account statements does not reflect any of these wire transfers ever occurring.[14]  This is because there were no wire transfers. *See id.*, ¶ 59.

164. For example, Prime's Internal Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000.00 on December 23, 2021 and $12,158,250.00 on December 31, 2021.  Those dates and amounts correspond exactly with the value of the first two Replacement ETH Purchases. *See id.*, ¶¶ 58–62.

165. These incoming wire transfers are not reflected or reported on Prime's bank account statement for December 2021. *Id.*  That is because they never occurred.

166. These incoming wire transfers were manufactured by Prime to conceal the fact that it was using fiat transferred to it by other customers to fund the Replacement ETH Purchases it used to cover the Abra ETH Withdrawals.

167. When questioned about these wire transfers reflected on Prime's Internal Ledger, ████ admitted that the Internal Ledger entries were fake and that "there were no wire transfers":

---

[14]   Attached as Exhibit C is the portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021.  Attached as Exhibit D is the portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021. *See id.*, ¶ 60.

> Q:    When it says funds transfer in column F and it says "wire, wire, wire." Do you see that?
>
> A:    Yes.
>
> Q:    ***There were no wire transfers; right***?
>
> A:    ***Yes***.
>
> Q:    ***Just to be clear.  Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?***
>
> A:    ***Yes, there were no wire transfers***.

█████ Dep., 164:22–165: 2–10 (emphasis added).

168.    With respect to the Internal Ledger recording of an incoming wire transfer of $11,958,000 on December 23, 2021, █████ admitted that it was a fake Internal Ledger entry:

> Q:    But, to be clear, there was no wire transfer of 11,958,000; right?
>
> A:    That is correct.
>
> Q:    So this contribution information for wire 11.958, there was no new cash provided to the bank account that held fiat deposited by other customers; right?
>
> A:    That is correct.

█████ Dep., 159:11–19.

169.    █████'s testimony also explained that the reason Prime's bank account statements did not reflect these incoming wire transfers is because the wire transfer did not occur:

> Q:    And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?
>
> A:    Correct.

█████ Dep., 166:5–24.

**E.    The Abra ETH Withdrawals Constitute Avoidable Actual Fraudulent Transfers**

170.    The Abra ETH Withdrawals constitute actual fraudulent transfers subject to avoidance.

171.    The Abra ETH Withdrawals occurred within two years of the Petition Date and Prime used fiat transferred to it by other customers to fund the Replacement ETH Purchases that were then used to satisfy the Abra ETH Withdrawals with the actual intent to hinder, delay, or defraud its creditors.

172.    The circumstances surrounding the Abra ETH Withdrawals demonstrate sufficient badges of fraud.

173.    Prime and Abra had a proximate relationship through continuous business dealings, and it is through that relationship that Abra received the Abra ETH Withdrawals.

174.    Prime's debts were greater than all of its property such that Prime was insolvent at the time of the transfers.

175.    Prime's inability to access the 98f Wallet and Prime's use of fiat transferred to it by other customers to make the Replacement ETH Purchases directly resulted in Prime being unable to pay other creditor liabilities.

176.    Indeed, Prime's inability to pay other creditor liabilities is the reason why the State of Nevada eventually imposed a receivership on Prime.

177.    A significant amount of Prime's estate was transferred to Abra.

178.    Prime transferred approximately 23,578 ETH to Abra, for which Prime paid $76,367,547.90 to Liquidity Provider funded by fiat transferred to Prime by other customers.

179.     The fiat Prime used to make the Replacement ETH Purchases comprised a substantial portion of Prime's assets.   In fact, at the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[15]

180.     The Replacement ETH Purchases made to satisfy the Abra ETH Withdrawals were designed to conceal and hold secretive the circumstances of the 98f Wallet, its inaccessibility, and Prime's use of customer-transferred funds.

181.     The Abra ETH Withdrawals are therefore actual fraudulent transfers subject to avoidance pursuant to Bankruptcy Code sections 544(b) and 548(a)(1)(A), and Section 1304 of Title 6 of the Delaware Code.

**F.     In the Alternative, the Abra ETH Withdrawals Constitute Avoidable Constructive Fraudulent Transfers**

182.     In the alternative, the Abra ETH Withdrawals constitute constructive fraudulent transfers subject to avoidance.

183.     The Abra New Account Agreement provided that Prime was "responsible for safekeeping *only* Custodial Property *which is delivered into its possession and control* by" Abra. Ex. B, § 4(c) (emphasis added).

184.     Because the ETH deposited by Abra to the 98f Wallet was never accessible to Prime, and remains inaccessible to Prime to this day, it was never delivered into Prime's possession and control.

185.     However, Prime nevertheless satisfied Abra's ETH Withdrawal requests by obtaining additional ETH through the Replacement ETH Purchases.

---

[15]     *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

186.    When Prime transferred ETH to Abra that Prime obtained through the Replacement ETH Purchases, Prime received less than a reasonable equivalent value for that ETH.

187.    Accordingly, in the alternative, the Abra ETH Withdrawals constitute constructive fraudulent transfers subject to avoidance pursuant to Bankruptcy Code section 548(a)(1)(B).

## V.    Abra Cannot Trace the Assets It Transferred to Prime Because Prime Commingled Assets and Maintained Poor Records

188.    Abra would not be able to trace and identify the assets it transferred to Prime because Prime commingled assets in a way that makes it impossible to segregate which assets were provided to Prime by which specific customers.

### A.    Prime Commingled Fiat in Omnibus Bank Accounts

189.    Prime did not segregate fiat that customers transferred to it into separate bank accounts held for separate customers; instead, Prime held such fiat in commingled, omnibus bank accounts (the "Omnibus Bank Accounts").  *See* Ex. A, Brennan Decl., ¶¶ 16–19.

190.    Prime maintained Omnibus Bank Accounts primarily at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), and Signature Bank ("Signature").  *See id.* ¶¶ 12, 16; *see also* Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Agreement").  A copy of the BMO Agreement is attached as Exhibit E.

191.    A portion of the fiat that Prime generated from its business activities, which were used to pay Prime's operational expenses, also was held in the same Omnibus Bank Accounts that held fiat that customers had transferred to Prime.  *See* Ex. A, Brennan Decl., ¶ 16.

192.    The BMO Agreement does not state that Prime held assets with BMO "in trust for" or "for the benefit of" any party other than Prime.  *See* Ex. E.

193.    Instead, the BMO Agreement specifically provides that it "***is not for the benefit of any other person and no other person shall have any rights against [Prime] or [BMO Harris] hereunder***." *Id.*, § 15(e) (emphasis added).

194.    Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided." *See* Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "BMO Certification"). A copy of the BMO Certification is attached as Exhibit F.

195.    Moreover, Prime regularly transferred fiat between its various Omnibus Bank Accounts, further commingling funds. *See* Ex. A, Brennan Decl., ¶¶ 19–21.

196.    For example, Prime used one account it held with BMO Harris primarily to make wire transfers ("BMO x3077"). *See id.*, ¶ 20.

197.    BMO x3077 held commingled funds that it regularly received from other Omnibus Bank Accounts and from other Prime customers. *Id.* ¶ 21.

198.    At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[16] *See id.*, ¶ 23.

199.    Prime would regularly transfer funds into BMO x3077 from BMO x9934 on an as-needed basis to make outgoing wire transfers. *Id.*

---

[16]    BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion." *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions dated July 2021, attached as Exhibit G, § 25. Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts.

200.    The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.*, ¶ 24.  Because the funds in BMO x3077 were commingled, this meant that BMO x9934 also contained commingled funds.  *Id.*

201.    In addition to commingled funds from BMO x3077, BMO x9934 also contained funds transferred from other sources, such as Prime's Omnibus Bank Accounts at CRB and/or Signature.  *See id.*, ¶¶ 24–26.

202.    Prime's Omnibus Accounts at CRB and Signature operated in a similar manner as BMO x3077.  *Id.*  Specifically, Prime's CRB and Signature accounts commingled funds that were transferred to them from Prime's other Omnibus Bank Accounts and commingled funds that Prime customers had transferred to the accounts directly.  *Id.*

203.    Prime used one CRB account in the same way it used BMO x3077, except that Prime funded the CRB account on an as-needed basis to make transfers via automated clearinghouse ("ACH") instead of via wire.  *See id.*, ¶ 26.

204.    Thus, Prime appears to have used its different Omnibus Bank Accounts depending on what type of transfer it needed to make.  *Id.*

205.    Prime moved funds between different Omnibus Bank Accounts, regardless of the source of the funds, on an as-needed basis to satisfy different wire and ACH transfers.  *See id.*, ¶¶ 26–29.

206.    Prime typically made transfers between its Omnibus Bank Accounts in round numbers, without reference to any specific transactions, which suggests that Prime simply moved funds between its Omnibus Bank Accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *See id.*, ¶ 28.

207.   Prime also would transfer funds between Omnibus Bank Accounts that were primarily used for Prime's corporate operations and bank accounts containing fiat that had been transferred to Prime by its customers.  *See id.*, ¶ 16.

### B.   Prime's Poor Reconciliations Processes

208.   Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.  *See id.*, ¶¶ 31–42.  This further hindered the ability of Prime or anyone else to specifically identify which assets were transferred to Prime by which customer.  *Id.*

209.   Prime did not perform regular reconciliations of its assets, and, at least prior to March 2021, any reconciliations that Prime conducted were manual.  *See id.*, ¶ 31.

210.   Former Prime employees testified that Prime commingled assets transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

211.   ▮▮▮▮▮▮ ("▮▮▮▮"), Prime's former Chief of Regulatory Affairs, testified that "[r]econciliations were not being done in a timely manner."  *Deposition of* ▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▮▮▮▮ Dep."), 38: 23–24.

212.   ▮▮▮▮▮▮ ("▮▮▮▮"), Prime's former Chief Financial Officer, testified:

> Q:    Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?
>
> A:    I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

213.   ███   also testified that "[i]t would not surprise" him if customer assets were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15–22.

214.   ███, who largely designed and implemented Prime's reconciliations processes, discussed these processes both before and after March 2021:

> Q:   When you say it was a problem, what do you mean?
>
> A:   There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

███ Dep., 19:23–20:5.

215.   ███   prepared a report for a July 12, 2021 audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

## 2    Finding and Response Summary Matrix

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|------|-----------|---------|--------|----------|-----------|----------|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

216.    The below testimony from █████ demonstrates that not only did Prime hold customer assets in an omnibus, commingled manner, but also that this approach resulted in Prime's own employees being incapable of determining exactly where any assets transferred by a particular customer were located:

> Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—
>
> A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.
>
> Q:    And what does that mean to you, a client to have an omnibus account?
>
> A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account

at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:     And that was done at Prime Trust?

A:     It was done at Prime Trust.  It wasn't done very frequently, but there were—there were omnibus accounts at Prime Trust.

Q:     And do you know who was responsible for those accounts?

A:     I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

██████  Dep., 205:19–207:3.

217.    Another example of the confusion in tracing specific assets that customers had transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which Omnibus Bank Accounts were impacted by Prime's use of customer-transferred fiat to make the Replacement ETH Purchases:



On Sat, Dec 17, 2022 at 11:16 AM ▮▮▮▮▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:
▮▮▮▮

Do you know which banking account was used to see if we can determine what customer funds were utilized?

On Sat, Dec 17, 2022 at 2:12 PM ▮▮▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

All:
Yesterday I received another follow-up request from the NV FID and I'm requesting your assistance in preparing the response. ▮▮▮▮ is out of the office for a couple weeks so please send responses to me and cc him.

I have added names of the PT folks who I think are best suited to provide the information. If you think otherwise, please forward this request to the proper person and cc me and ▮▮▮▮

1. Regarding the User Agreement stated in the October 14, 2022 letter to the NFID, is this a disclosure on the website only or does every client sign acknowledgement of the User Agreement terms and conditions? - ▮▮▮▮▮▮▮
2. As stated in the letter, "the Company invested in additional Etherium using fiat currency from its omnibus accounts." Please provide a list of clients impacted from the investment and which omnibus accounts were utilized. - ▮▮▮▮
3. With the formation of the Executive Committee at the August 2, 2022 Board meeting, please provide Executive Committee minutes from the first meeting up through the most readily available minutes up to November 30, 2022. - ▮▮▮▮▮▮

Thanks for your help here.

▮▮▮▮

--
▮▮▮▮▮
General Counsel
Prime Trust LLC
408-430-9109
primetrust.com
☒

218.    ▮▮▮▮ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":



On Mon, Dec 19, 2022 at 9:28 AM ▮▮▮▮▮▮▮▮▮ @primetrust.com> wrote:

Hey ▮▮▮▮
Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

219.    ███████████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which assets and that they were "*not able to specify what customer is out the funds due to our omnibus structure*" (emphasis added):



### C.    The 98f Wallet Incident Further Exacerbated the Issue of Identifying Specific Assets Held by Prime

220.    The preceding subsections of Section V, *supra*, largely describe Prime's rampant commingling of assets and poor recordkeeping procedures *before* individuals at Prime intentionally corrupted the Internal Ledger and other internal records to conceal the Replacement ETH Purchases that used funds transferred to Prime by other customers, as described in detail in Sections IV.C–D, *supra*.

221.    The actions undertaken by these individuals at Prime to falsify Prime's Internal Ledger and records only exacerbated the already-impossible task of attempting to trace and identify specific assets held by Prime.  *See* Ex. A, Brennan Decl., ¶¶ 44–62.

## VI.    The Preferential Transfers to Abra

### A.    The Abra Agreements Governing the Preference Period

222.    Prime's Preference Period began on May 16, 2023—90 days before the Petition Date of August 14, 2023.

223.    In December 2022, Prime and Abra executed an Order Form which governed the parties' relationship from December 1, 2022 through November 30, 2023 (the "Abra Order

Form"). *See* December 2022 Order Form between Prime Trust LLC and Plutus Financial ABRA, attached as Exhibit H.

224.     The Abra Order Form stated that it was "governed by the Prime Trust Master Services Agreement" which Prime made available on its website (the "MSA") and "the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form." Ex. H, Terms and Conditions; *see also* Prime Trust Master Services Agreement, last revised August 30, 2022, attached as Exhibit I. The is included Prime's custodial service schedule, which was also available on Prime's website (the "Custodial Service Schedule" and, collectively with the Abra Order Form and MSA, the "Revised Abra Agreements"). *See* Service Schedule for Prime Trust Custodial Services, last revised May 13, 2022, attached as Exhibit J.

225.     The MSA and the Custodial Service Schedule which governed Abra's relationship with Prime from December 2022 through November 2023—and thus during the Preference Period—clearly do not establish any trust or fiduciary relationship between Abra and Prime.

226.     For example, the MSA unequivocally provides that it "***does not create a*** . . . ***fiduciary*** . . . ***relationship between the Parties***." Ex. I, § 14.1 (emphasis added).

227.     The Custodial Service Schedule also authorized Prime to take certain actions with assets transferred to it by Abra for custody that are entirely antithetical to those which would be authorized under a trust or fiduciary relationship. For example, the Custodial Service Schedule authorizes Prime to:

> *[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk.* Without limiting the foregoing, ***Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets***

> **with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency**[.]

Ex. J, § 2.7(b) (emphasis added).

228.    Thus, the Revised Abra Agreements governing Prime and Abra's relationship during the Preference Period make clear that Prime and Abra entered a debtor-creditor—and not a trust or fiduciary—relationship.

### B.    The Preferential Transfers

229.    During the Preference Period, Prime transferred to Abra $45,486,117.22 in fiat currency via 2,168 outgoing wires and ACH transactions.  *See* Ex. A, Brennan Decl., ¶ 67.

230.    During the Preference Period, Abra transferred to Prime $37,771,991.88 in fiat currency of potential subsequent new value.  *See id.*, ¶ 69.

231.    Thus, Abra's preference exposure is no less than $7,714,125.34 (the "Preferential Transfers").  *Id.*

232.    Abra's fiat transactions with Prime prior to the Preference Period differed markedly from Abra's fiat transactions with Prime during the Preference Period.  *See id.*, ¶ 66.

233.    For example, from February 14, 2023 to May 15, 2023 (prior to the Preference Period), Abra and Prime averaged 2,011 monthly fiat transactions between the parties.  *Id.*

234.    During the Preference Period, the average monthly fiat transactions between Abra and Prime jumped up to 2,566 transactions per month.  *Id.*

235.    The average weekly outgoing transfers from Prime to Abra during the Preference Period was $8,166,269, which represents an 87.4% increase compared to the average weekly outgoing transfers from Prime to Abra prior to the Preference Period of $4,358,603.  *Id.*

236.    The vast majority of outgoing wire transfers from Prime to Abra during the Preference Period ($39,352,484.94 or 87% of the total outgoing amount) were transferred from

Prime's BMO x3077 account. *See id.*, ¶ 71. As previously explained (*see supra*, ¶¶ 195–203), the fiat in BMO x3077 was commingled fiat from numerous sources. *See also* Brennan Decl., Ex. A., ¶ 70.

237. The Brennan Decl. examines a single day (June 8, 2023) of deposits and withdrawal from BMO x3077 to illustrate the extensive commingling that occurred and what it means for the Preference Period fiat transactions, such as those with Abra. *See id.*, ¶¶ 75–89.

238. As reflected in Brennan Decl., on June 8, 2023, Abra made seven deposits totaling $531,074.33 into Prime's CRB x9892 account, which received a total of 208 deposits from numerous sources that day. *See id.*, ¶ 79. Abra did not receive any outgoing wires from CRB x9892 on June 8, 2023. *See id.*, ¶ 83.

239. Instead, on June 8, 2023, Abra received three outgoing wires from BMO x3077 totaling $983,266.75. *See id.*, ¶ 77. On this day, there was a total of 257 incoming transfers to BMO x3077 amounting to $35,619,625.91 and a total of 102 outgoing transfers to BMO x3077 amounting to $35,718,672.19. *See id.*, ¶ 76.

240. While CRB x9892 made some periodic transfers to BMO x3077, Prime made these transfers between accounts in round dollar amounts—meaning that Prime, as was its typical practice, likely moved funds between accounts on an estimated basis without reference to actual transaction activity. *See id.*, ¶ 83.

241. For example, on June 8, 2023, there was one transfer of $7,000,000.00 from CRB x9892 to BMO x3077. *See id.*, ¶ 84. However, given that CRB x9892 received an additional $1,239,770.07 from other sources besides Abra on June 8, 2023, there is no way to trace any of the $531,074.33 Abra transferred to CRB x9892 account to the $7,000,000.00 that was transferred

from CRB x9892 to BMO x3077 (which, of course, was also commingled itself).  *See id.*, ¶¶ 85–86.

242.    The remaining outgoing transfers from Prime to Abra during the Preference Period ($6,133,632.28 or 13% of the total outgoing amount) consisted of ACH transfers from Prime's CRB x4453 account.  *See id.*, ¶¶ 70, 88.

243.    Using the same example, on June 8, 2023, Abra's ACH activity consisted of 26 incoming transfers totaling $66,758.66 and 24 outgoing transfers totaling $99,721.64 (all of which flowed through CRB x4453).  *See id.*, ¶ 87.

244.    The total transaction activity for CRB x4453 on that day amounted to an additional $943,648.12 of transfers in and $1,213,626.54 of transfers out.  *See id.*, ¶ 88.

245.    Since these total amounts far exceed the balance of the transactions associated with Abra, there is no way to conclusively determine that the funds Abra transferred into CRB x4453 sourced any of the outgoing ACH transfers to Abra.  *See id.*, ¶ 89.

### C.    The Preferential Transfers Are Avoidable

246.    Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

247.    First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

248.    Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made."  11 U.S.C. § 547(b)(2).

249.    Thid, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

250.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

251.    Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would have received in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

252.    The Preferential Transfers were transfers of an interest of Prime's property.  As established above, the Revised Abra Agreements did not create a trust or fiduciary relationship between Prime and Abra.

253.    The Preferential Transfers were made to or for the benefit of Abra, a creditor of Prime, by virtue of Prime and Abra's debtor-creditor relationship pursuant to the Revised Abra Agreements.

254.    At the time of the Preferential Transfers, Prime owed Abra fiat currency.  Thus, the Preferential Transfers were made on account of an antecedent debt.

255.    The Preferential Transfers were made while Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

256.    As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[17]  If not avoided, the Preferential Transfers will enable Abra to receive more than Abra would have received on account of its claim in a hypothetical liquidation under chapter 7 had Prime not made the Preferential Transfers during the

---

[17]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

Preference Period in satisfaction of Prime's antecedent debt to Abra.  *See Notice of Filing of Revised Liquidation Analysis* [Docket. No. 497].

257.    The Preferential Transfers were made on or within the 90-day Preference Period immediately preceding the Petition Date (*i.e.*, between May 16, 2023 and August 14, 2023)

258.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Preferential Transfers during the Preference Period performed by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid the Preferential Transfers even after taking into account Abra's alleged affirmative defenses.[18]

259.    Accordingly, the Preferential Transfers to Abra on or within the 90-day period immediately preceding the Petition Date constitute preferential transfers pursuant to section 547(b) of the Bankruptcy Code that are subject to avoidance pursuant to section 550 of the Bankruptcy Code.

260.    During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to Abra during the Preference Period.  It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Abra or any other transferee.  PCT reserves its right to amend this original Complaint to include:  (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revisions to Abra's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

---

[18]    It is Abra's obligation to establish all possible affirmative defenses, including subsequent new value.

## VII.    Prime's Receivership and Chapter 11 Filing

261.    Prime's financial conditioned worsened over time as it was ultimately unsuccessful in its attempts to regain access to the 98f Wallet.

262.    In August 2022, the executives at Prime who knew of the issues with the 98f Wallet reported the issues to Prime's board of directors.

263.    Between September and November 2022, Prime reported the 98f Wallet issues to Nevada FID.

264.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel held multiple meetings with Nevada FID to determine how to handle Prime's solvency issues.

265.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing— leaked to the crypto and financial markets.

266.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to acquire Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

267.    On June 21, 2023, Nevada FID issued an *Order to Cease and Desist from Violations of NRS 669* (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re*

*Prime Trust, LLC, Order to Cease and Desist from Violations of NRS 669*, Nevada FID (Jun. 21, 2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and crypto deposits.  *Id.*

268.    On June 22, 2023, the day following the Cease and Desist Order, BitGo canceled its acquisition of Prime.  One report claimed that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business."  *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, COINDESK (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-acquisition/.

269.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court").  *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.  The Nevada FID Petition directed Prime to cease and desist all retail trust activities.  *Id.*

270.    The Nevada FID Petition contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from its customers in commingled accounts.

271.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its omnibus customer accounts." *Id.* at 6 (emphasis added).

272.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

273.    On July 14, 2023, the Nevada Court placed Prime under receivership.

274.    On August 14, 2023 (the Petition Date), Prime initiated the Chapter 11 Cases by filing voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Actual Fraudulent Transfer, 11 U.S.C. § 548(a)(1)(A)

275.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

276.    Prime transferred 23,578 ETH to Abra to satisfy the Abra ETH Withdrawals.  The Abra ETH Withdrawals were transfers of an interest of Prime in property to or for the benefit of Abra and are avoidable as "transfer[s]" within the meaning of Bankruptcy Code section 101(54).

277.    The Abra ETH Withdrawals occurred within two years before the Petition Date.

278.    Prime satisfied the Abra ETH Withdrawals using fiat transferred to it by its other customers with the actual intent to hinder, delay, or defraud Prime's other creditors, as the Replacement ETH Purchases used to satisfy the Abra ETH Withdrawals were designed to conceal the circumstances of the 98f Wallet, its inaccessibility, and the use of funds transferred to Prime by its customers.

279.     Prime also satisfied the Abra ETH Withdrawals using ETH transferred to Prime by its customers which Prime held in commingled omnibus digital wallets with the actual intent to hinder, delay, or defraud Prime's other creditors, as Prime's use of the commingled ETH was designed to conceal the circumstances of the 98f Wallet, its inaccessibility, and the use of funds transferred to Prime by its customers.

280.     Prime was insolvent when it made the transfers since the use of customer funds to cover the Abra ETH Withdrawals left Prime unable to pay other creditor liabilities.

281.     Accordingly, the Abra ETH Withdrawals are avoidable as actual fraudulent transfers under Bankruptcy Code section 548(a)(1)(A).

## Count II
### Avoidance of Preferential Transfer, 11 U.S.C. § 547(b)

282.     PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

283.     Each of the Preferential Transfers was a transfer of an interest in property of Prime.

284.     Each of the Preferential Transfers was made for or on account of an antecedent debt owed by Prime before the Preferential Transfers were made.

285.     The Preferential Transfers were made to or for the benefit of Abra.

286.     Each of the Preferential Transfers was made within 90 days of the Petition Date.

287.     At the time of the Preferential Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.  If not avoided, the Preferential Transfers would enable Abra to receive more than Abra would have received in a hypothetical chapter 7 case had Prime not made the Preferential Transfers.

288.     Abra has not repaid all or a part of the value of the Preferential Transfers.

289.    Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Abra could assert, including Abra's potential defenses under Section 547(c) of the Bankruptcy Code, and believes that the Preferential Transfers are avoidable.

290.    Accordingly, PCT is entitled to recover from Abra not less than $7,714,125.34 as Preferential Transfers pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

### Count III
### Avoidance of Actual Fraudulent Transfer, 6 Del. C. § 1304(a)(1) and 11 U.S.C. § 544(b)

291.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

292.    Prime transferred 23,778 ETH to Abra to satisfy the Abra ETH Withdrawal Requests. The 23,778 ETH was a transfer of property from Prime to and for the benefit of Abra and is avoidable as a "transfer" within the meaning of 6 Del. C. § 1301(12) and Bankruptcy Code section 101(54)

293.    The Abra ETH Withdrawals occurred within four years before the Petition Date.

294.    At all times material hereto, there were actual creditors of Prime holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

295.    Accordingly, actual fraudulent transfers are avoidable pursuant to Bankruptcy Code section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, 6 Del. C. § 1301, *et seq.*

296.    Prime satisfied the Abra ETH Withdrawals using fiat and ETH transferred to Prime by other customers with the actual intent to hinder, delay, or defraud Prime's creditors, as the Replacement ETH Purchases and Prime's use of commingled ETH used to satisfy the Abra ETH

Withdrawals were designed to conceal the circumstances of the 98f Wallet, its inaccessibility, and the use of customer funds.

297.    Accordingly, the Abra ETH Withdrawals are avoidable as actual fraudulent transfers pursuant to 6 Del. C. § 1304(a)(1) and Bankruptcy Code section 544(b).

## Count IV
### Avoidance of Constructive Fraudulent Transfer, 11 U.S.C. § 548(a)(1)(B)

298.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

299.    Abra transferred 23,778 ETH to a digital wallet address over which Prime had neither possession or control.

300.    Because Prime transferred 23,778 ETH to Abra that it could not and never was able to access, Prime did not receive reasonably equivalent value in exchange for 23,778 ETH.

301.    The Abra ETH Withdrawals were transfers of property from Prime to and for the benefit of Abra and are avoidable as "transfer[s]" within the meaning of Bankruptcy Code section 101(54).

302.    The Abra ETH Withdrawals occurred within two years before the Petition Date.

303.    The Abra ETH Withdrawals were made while Prime was (i) insolvent; (ii) engaged in business or a transaction, or was about to engage in a transaction, for which its remaining property represented unreasonably small capital; or (iii) intending to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

304.    Accordingly, in the alternative to Counts I and III, the Abra ETH Withdrawals are avoidable as constructive fraudulent transfers under Bankruptcy Code section 548(a)(1)(B).

**Count V**
**Property Recovery on Account of Fraudulent and Preferential Transfers, 11 U.S.C. § 550**

305.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

306.    PCT is entitled to avoid the Abra ETH Withdrawals and the Preferential Transfers pursuant to Bankruptcy Code sections 544, 547, and 548, and 6 Del. C. § 1304(a)(1).  Abra was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

307.    Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Abra: (i) the greater of the following at the time of actual recovery (a) 23,778 ETH, or (b) cash in an amount equal to the greatest value of 23,778 ETH at any time since the ETH Purchases, plus interest at the maximum legal rate and to the fullest extent allowed by applicable law; and (ii) not less than $7,714,125.34 USD as Preferential Transfers.

**Count VI**
**Claim Objection, 11 U.S.C. § 502**

308.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

309.    Abra has filed claims in these Chapter 11 Cases.

310.    As alleged above, Abra was the initial transferees of the Transfers, or the immediate or mediate transferees of such initial transferees, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to Sections 547(b) and/or 548 of the Bankruptcy Code, which are recoverable from Abra under Section 550 of the Bankruptcy Code.

311.    Pursuant to Section 502(d) of the Bankruptcy Code, in the event Abra is liable for any avoidable transfer under sections 547(b) and/or 548 of the Bankruptcy Code, any claim(s) of

Abra that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Abra pays PCT the value of the Transfers.

### **PRAYER FOR RELIEF**

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.      Enter judgment in favor of PCT and against Abra, avoiding the Abra ETH Withdrawals pursuant to Bankruptcy Code sections 544(b) and 548 and 6 Del. C. § 1304(a)(1) and directing Abra to return to PCT the greater of the following at the time of actual recovery (i) 23,778 ETH or (ii) cash in an amount equal to the greatest value of 23,778 ETH at any time since the Abra ETH Withdrawals, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorney's fees and costs;

B.      Alternatively, enter judgment in favor of PCT and against Abra, avoiding the Abra ETH Withdrawals pursuant to Bankruptcy Code sections 548 and directing Abra to return to PCT the greater of the following at the time of actual recovery (i) 23,778 ETH or (ii) cash in an amount equal to the greatest value of 23,778 ETH at any time since the Abra ETH Withdrawals, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorney's fees and costs;

C.      Enter judgment in favor of PCT and against Abra, avoiding the Preferential Transfers pursuant to Bankruptcy Code section 547 and directing Abra to return to PCT no less than $7,714,125.34 for the Preferential Transfers, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorney's fees and costs;

D.      Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Abra against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Abra relinquishes to PCT the amount ordered as an award for avoidable transfers.

Dated:  May 27, 2025
       Wilmington, Delaware

McDERMOTT WILL & EMERY LLP

/s/David R. Hurst
David R. Hurst (I.D. No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:      dhurst@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:      dazman@mwe.com
       jbevans@mwe.com
       jpardo@mwe.com
       ggriffith@mwe.com
       pkennedy@mwe.com
       mduque@mwe.com
       jaminov@mwe.com

*Counsel to PCT Litigation Trust*